Thank you. The next case is SEB v. Montgomery Ward. Mr. Dunnigan, when you're ready. May it please the Court. My name is Bill Dunnigan. I represent the appellants, Pentalfa and Global Tech. I'd like to begin with Section 271B. The specific issue is whether or not a claim for inducement under 271B can be based upon constructive knowledge of the patent. It's our position that it cannot, and that 271B requires actual knowledge of the patent. Even if you're right, though, the jury found there was direct infringement. Your Honor, let's look at that closely. The jury found that there was direct infringement and induced infringement of both devices. The jury also found, in response to Question 6, I believe, that there was $4.6 million of damage due. However, there is no linkage in the record between what the jury found as a basis for liability and the damage award. With respect to this particular issue, we don't know how much damage that the jury awarded for direct infringement. I argue to the jury that there should be no damages awarded, even if the jury found that there was an offer to sell in the United States, because reasonable royalties don't result from an offer to sell. They only offer from sales. I also argue to the jury that there were no sales in the United States because they took place in Hong Kong or in China. The jury could have agreed with me on both of those arguments. The fact that it got to the jury in the first instance is evidence that a reasonable person could have agreed with me for both of those arguments. So with respect to each of the three bases of liability, direct as a result of sales, direct as a result of an offer to sell in the United States, and inducement under 271B, there's not a link to the damage. So if there's an error with respect to any one of those three, we think that there has to be a remand for a new trial. We had asked the judge to delineate which damages for which theory. He thought that was too complicated, but we're left with the state of the record. If there's an error on any one of those three, there needs to be a remand. Now, with respect to the issue of whether there is an error on 271B, we have the DSU case, which everyone participated in, and it could possibly be construed as dicta, but it says clearly and plainly that the requirement that the alleged infringer knew or should have known that his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent. So it seems to me that the members of this Court agreed that there's a bright line test for inducement. If you don't know about it, you can't be inducing infringement for that period of time. Why doesn't the record make it perfectly clear in this case that the jury found that there was actual knowledge of the patent? And by that, I look to the instruction on willfulness, which says willfulness must be proven by clear and convincing evidence that defendants, among other things, defendants had actual knowledge of the patent, and the jury finds willfulness. It seems to me that's a finding of actual knowledge. But for what time period, Your Honor? It's undisputed in the record that before April of 1998, Pentalpha had no actual knowledge of the patent. If you look at the charging conference when the judge is talking about their charge of willfulness, he makes clear on the record that there's no evidence before April of 1998 that Pentalpha had any knowledge of this patent. And if the jury were to have found, well, the jury did find actual inducement, but we don't know for the time period. And the jury could have awarded the entire $4.6 million of damages based upon inducement. We could take a guess and say that it didn't, but that's no more than a guess. Now, if I can move on to the issue of plain construction and specifically the meaning of the term completely free. Now, the district court held that completely free meant completely free of thermal bridges. Let me try to explain why under the doctrine of prosecution disclaimer, that's error. Now, on February 11th, excuse me, February 14th of 1989, during prosecution, Seb represented to the patent examiner. But the figure one in the only embodiment shows a stabilizing screw. We've said in Phillips and repeatedly thereafter that it'd be very strange to interpret claims to read out the embodiment. And in this case, the only embodiment. In Lester's surrender during prosecution, Your Honor, in Omega and two other cases that we cited in our brief, this court said, or at least panels of this court said, that if an appellant, excuse me, if an applicant clearly and unequivocally disclaims that their patent covers a certain subject matter, then they can't go back and reclaim that, even if that's their embodiment. And it seems to me just as a common sense matter. How can we have a situation where the applicant writes a very broad claim and a very broad embodiment, then during prosecution argues that that embodiment should be limited for reasons that the appellant states, based upon a definition that the applicant provides, and then for the applicant to then go back in an infringement action to a court and say, the definition that they provided of a term really didn't mean what they said clearly and unambiguously that it meant, because it's inconsistent with the broad embodiment which they wrote in their patent. An applicant can't have it both ways. They need to decide while they're prosecuting the patent what their patent is going to cover, and they can't recapture something that they've surrendered, even if it's within their preferred embodiment. You're going to read to us the distinction over Onishi, right? I was going to do that, Your Honor. We've looked at it. Why can't that just be read to talk about the sides of the skirt? Even Onishi, which is different because it's a rice cooker and doesn't heat up as much as these deep fryers, but even Onishi has a stabilizer, doesn't it? Your Honor, I don't recall I'd have to look at it. But the question isn't, at this point for prosecution disclaimer, what the prior art was. It's what the applicant told the patent examiner that his invention was. Now, to distinguish Onishi... What about Claim 8 that specifically claims the connecting pin? That's the doctrine of claim differentiation, which this Court said in 2008 was a presumption, which can be overcome by the prosecution history. Because if Claim 8... We should now overlook the presumption relating to claim differentiation, and we should overlook the idea that you don't construe claims to read out the preferred embodiment. What else should we overlook? You should not overlook the fact that they told the examiner that in their product there was no solid material between the pad and the skirt, and that that area was occupied entirely by air. A competitor could reasonably read that language and say, if they said that, they must mean it. Therefore, if I design a product which has something besides air between the pad and the skirt, and that something is solid material, then I should be beyond the scope of that patent. But it seems to me you're reading that snippet of the prosecution history in isolation. Isn't it appropriate to look at the entire prosecution history and the context in which that statement was made? I don't think so, Your Honor, and the reason is, if that statement is clear and unambiguous, then it should trigger prosecution history disclaimer. Regardless of the context in which it was made? Yes, Your Honor, because if it's clear and ambiguous, a competitor should be able to rely upon it. Clarity often depends on context. I mean, a statement made without recognition of context may seem clear enough, but the context can render it much less clear. That happens in statutes all the time. I think it happens in prosecution history. I mean, obviously, we have to look at the context. That's, I mean, you... If you look at, Your Honor, if you're looking at the... That proposition seems to me just uncontrovertible. If you're looking at the context to determine whether or not this is, whether or not the language distinguishing obesity is clear and unambiguous, I would agree with it.  In context. Then the thing that they said, which is 180 degrees different, earlier or in the specification or in the drawings, just shouldn't control. Why can't we read that, however, as talking just about the sides of the pan? That's the only place where you're going to come in contact with it anyway. So that's the area that's entirely free and no solid connection. Why can't we read it? Well, the side is the bottom side, Your Honor. I mean, and it doesn't say just the lateral sides. It says there between, the pan and the skirt. The skirt has to surround the lateral and bottom walls of the pan, and that's what that language refers to. I believe I'm into my rebuttal time, and I'd like to resign. All right. Thank you, Mr. Dunnegan. Mr. Zivin. Good morning, Your Honor. It's Norman Zivin for Group SEB. Can you talk about this Onishi reference? Certainly. The Onishi reference shows a rice cooker which cooks at the boiling temperature of water, which is about 100 degrees C, as we all know, compared to deep frying, which takes place at 170, 180, 190 degrees C. It's a much lower temperature. The Onishi reference has what they called an adiabatic material, an insulator, between the inner pan and the outer wall. And I think that all the attorney meant when he was prosecuting the application was to say that we don't have this insulating material between the pan and the outer wall, that there's just an air gap in between. The screw is a minor little component which occupies very little space. It's contained within a plastic shield to keep it away from that interior airspace. So that was the difference. The issues that we have raised on our cross appeal relate to the enhanced damages. Could you address the other point first that Mr. Dunning had raised? Is there knowledge of the patent on the record or not? They did not admit that they had any knowledge of the patent until April of 1998, which was a little over a year before we filed the lawsuit. They do admit that they had knowledge of the patent at that time, as they should, because we had first brought a lawsuit against Sunbeam, who was their distributor and original customer in the United States, for patent infringement. And on the day that we served the complaint on Sunbeam, they immediately sent a copy to Pent Alpha with the patent saying, what are you going to do about it? Tell us what DSU means. That's a hot potato here, Honor. I'll say what I think. Obviously, Your Honor wrote the decision for the court on Ponk, and the sentence that's, I suppose, the most critical, talks about known or should have known of the inducement, which necessarily includes knowledge of the patent. And then the concurring opinion says, we don't change the standard of the incitiform case, which says, knew or reasonably should have known of the patent. I wish I could reach a conclusion on that. Incitiform also says actual or constructive knowledge. Correct. What does constructive knowledge mean? Well, it can mean several things. I suppose it could mean that the patent number is marked on the product and thereby gives constructive knowledge. Or it could mean that... Not actual knowledge? Well, even if you didn't see the product, I suppose you could have constructive knowledge simply by the fact that there is a marking of the patent on the product. But it could also mean a situation that we have here, and that is, it was admitted, and it is in the record, that the defendants purchased a Ceb fryer in Hong Kong, and they took it apart, and they copied it. And one who was acting in an objectively business-like manner should have known that the product is probably patented. Pentelpha had made other products, not this product. Did you know that it is probably patented because it is a product? No, because Pentelpha had made other products, like rice cookers, for example, for Ceb, and they knew that their practice was to patent the product. They should have made a search, and they did make one. So then, the should have known that it was patented derives from the fact that they understood that their general practice was to get patents for things. I think that is a fair statement. It may not be in the record, but I think that is a fair statement in terms of trying to interpret what the standard might be. The specific intent required for inducement can be found in a case where someone understands that it is the general practice of the party to get patents on things. Well, it is not just that, Your Honor, but I think it is not only the general practice, but the fact that you are copying the product. There are situations, as we all know in the patent law, where someone comes out of the blue with a patent, and the manufacturer may have no knowledge whatsoever that there was a patent, wouldn't have even thought there was one. But when one is copying a product that is being sold and where the sales are good, you should have a reasonable belief that maybe there is a patent on this product. How much of the sales and ultimately the damages are attributable to period after April 1998? In my view, Your Honor, virtually none. And the reason is this. The Sunbeam settled with Seb by paying them $2 million. That is in the record. That $2 million is equatable to 189,000 units which Pentalpha had sold to Sunbeam through June of 1998. That is when the settlement took place. Pentalpha had taken the position throughout the case that that is all they sold were 189,000 units. And that is what their president testified in the deposition in this case and what he testified to in a Sunbeam trial. And therefore, I think it is fair to say that the $2 million settlement was really for the 189,000 units that were sold prior to June of 1998. Pentalpha has admitted that they were aware of Seb's patent as of April of 1998. So I think it is fair to say that the credit that the district court gave to Pentalpha for the payment that Sunbeam had made to Seb covered all of the product they had until after they had actual notice. And therefore, our position is that the whole issue of lack of knowledge for the purpose of inducement of infringement is really moot in view of that credit. Well, you have given us your off-the-cuff take on the damages, but did the district court ever chop up the sales and the damages in the way that you have, in a way that we can look at the record? Because based on your representations, it is kind of difficult for us to do much with this issue. I understand it is a factual issue. The district court did not parse it the way that I suggested. Do you understand the willfulness finding by the jury, as your opposing counsel does, to be referenced only to the post-April 1998 period? If you go back and you look at the fact that the district court gave Pentelpha the $2 million credit for the Sunbeam payment, which included certainly all the units that were through April 1998, if not more, then the willfulness, and there were two separate willfulness findings by the jury, one as for their first product and one for their so-called modified product, then the willfulness findings by the jury necessarily must be for products that occurred after April, or indeed even after June of 1998. And therefore, those willfulness findings should have remained in effect, in our view, even after the Seagate decision. I kind of thought you were going to argue the other side of that, which is that the findings of willfulness pertain to the pre-April 1998 and therefore obviate the need to decide, for purposes of 271b, whether there was actual knowledge of the patent. But I guess you're supporting Mr. Dunnegan's argument with respect to the willfulness not being applicable pre-April 1998. No, I think there was willful behavior before that time. Is there anything in the record that suggests that the jury so found? Or is Mr. Dunnegan right that the jury verdict can be understood as limiting the willfulness finding to the post-April 1998 period? No, I think the... You understand where I'm going with this, right? Yes, I understand. And the problem I think we're facing is that the Seagate decision made a change in the... I'm not interested right now in talking about Seagate and willfulness. I'm interested in talking about the effect of the specific finding of the jury, albeit in the context of willfulness, but the specific finding of the jury as to knowledge of the patent and whether that covers the pre-April 1998 period. That, if it does, then that solves your problem with 271b, correct? It does, yes. Right, but you're not helping me very much in reaching the conclusion that it does apply to pre-April 1998. In fact, you're sort of supporting Mr. Dunnegan's position that it doesn't. No, I'm not, Your Honor, supporting Mr. Dunnegan's position. Well, you're not advocating it, but you see everything you're saying seems to be giving it some support. But I'm looking to see if there's any pushback from you on that issue. No, I think there was evidence of willfulness prior to that time. Evidence of willfulness? But was there any finding by the jury as to which you can say there's something in this record that indicates this jury made a finding of willfulness that pertains necessarily to the pre-April 1998 period? The jury made a separate finding of willfulness with respect to the original product that was sold. All right. Now, was that product identified with the pre-April 1998 period alone? It overlapped. Part of it was prior to April of 1998, and some part of it existed until 1999. All right. So that's the fact. Okay. But what I'm trying to say is that the willfulness argument is applicable even despite Seagate because of the fact that it was objectively reckless. There was evidence that the jury did not hear, which made it even more so, and that is that there were two preliminary injunctions issued by the district court in this case, one with respect to the original product and one with respect to the modified product. Those preliminary injunctions make it clear that an objectively rational business person should not have been selling that product. They knew that they had copied the product. That was a finding of fact. The jury heard that testimony. They knew that there was a patent that was issued, and they kept selling it. They didn't make any change for a year and a half after they admitted they had knowledge of the patent. And therefore, our position is that the district court, although he did a fine job on analyzing the rest of the case, when he took away the enhanced damages and the attorney's fees, I believe that he erred in overextending the Seagate ruling. Mr. Donegan also makes many other arguments. He's trying to distinguish between inducement and direct infringement. The jury did not make those distinctions. They found liability under each of these theories. I believe that the... Well, each? I mean, did the jury specifically say we find all the... I mean, the question is whether the jury made a determination as to that you could associate all the damages with direct infringement. There's nothing that we can grab hold of on that, is there? They found twice that there was direct infringement, one by the original product and one by the modified product. They found that there was inducement both by the original product and by the modified product. And once again, trying to get at this question of the pertinence of the 271B issue in the case, is there a way to say that the jury's finding as to direct infringement necessarily establishes all of the liability under direct infringement? I think the jury found that all of the units were direct infringements, whether it was... What did they say that... Point me to the place that I can look at in the record and satisfy myself that that's what the jury found, i.e., all of the units direct infringement. I don't think it was differentiated that way. Well, that's what Mr. Dunnegan says, that it wasn't differentiated. What I'm saying, Your Honor, it was not differentiated, but it doesn't make any difference. Why? Because there's liability under direct infringement both on sales, offers for sale, and inducement for sale. So you just can't get out of it one way or the other. He's trying to parse it, but there's no way to parse it. But you threw inducement into that group. I'm trying to see if there's a way to decide this case without having to deal with the inducement problem that Mr. Dunnegan and you have been discussing. There's no question that all of the units were sold pursuant to direct sales to American customers from Sunbeam to Fingerhut to Montgomery Ward. And there's lots of evidence showing that they entered into a contract to sell it governed by Florida law. They made the contract in Florida. They made the goods for the United States market. They were all American-made goods. They were marked with the trademarks of these customers. They were invoiced directly from Pent Alpha to the American customers. They were direct sales in the United States. Am I understanding you correctly, then, that you're saying the record supports the fact that all of the damages claimed relate to the units that you argued before the jury were subject to direct infringement? That is correct, Your Honor. And there wasn't a separate evidentiary submission with respect to units that were not subject to direct infringement but might have been subject to induced infringement. That's correct, Your Honor. All of the units were direct sales to American customers in the United States. We were not getting any damages for some mere offers that weren't consummated. We were not getting any damages for some other activity. It was all for goods that were actually made and shipped directly to the United States. Thank you, Mr. Zibin. Mr. Dunnigan, you have four and a half minutes left. To address Judge Bryson's question about is there any place in the record where there's a distinction on willfulness based upon the April 1998 date, the record 2308, this is the charging conference and we are deciding whether or not there should be a date in the charge for April of 1998. And I'm saying that there should be, and the judge says he disagrees with me. He's saying, okay, is there anything in the record from which the jury could infer? Because frankly, I think this means that we don't have to break out the dates. If they find willfulness with respect to the original Deep Friar, it has to be that date, meaning April of 1998 going forward. Because there's been no evidence that it could possibly be any date earlier than that and no one will deny that they had actual knowledge on that date. Ms. Miller, yes, I agree. So I don't think we have to break out the instruction. I think that's an agreement on the record that there's no evidence of actual notice of the patent before April of 1998. Now, if the court wishes to look at the jury verdict form at A2506 and A2507, you can see that the question, how much reasonable royalty should be awarded on 2508, does not depend upon the theory of liability that the jury finds. And while we could guess as to what the jury actually did or what it most likely might have done, there is no finding by the jury that it was the direct infringement that caused the damage, or it was the sales in Hong Kong that caused the damage, or it was the offer to sell which caused the damage. Now, Mr. Zibin has also raised the issue of how do we allocate this $2 million payment by Sunbeam. Can that be allocated to all the sales which occurred before April of 1998? The answer is no, for a couple of reasons. First, the district court didn't make that allegation. Second, there's no theoretical basis to make that allegation. Third, if we look at the agreement with Sunbeam, it provides that it didn't cover 189,000 units, it covered 350,000 units. And I'm looking at page 2777 of the record in the top paragraph. Is there anything in the record that indicates that Pentalpha sold some products differently than others so that direct infringement only applied to some of the accused products? That was Mr. Zibin's response to you, as he said, all of the products were sold the same way, they all came to the U.S., there's no way you can break them out. Can you? Yeah, well, here's a way we could do it. With respect to the sales to Sunbeam, the principal of our client went down to Florida in 1997 and actually signed a piece of paper which offered to sell Deep Fryers. That could be construed as an offer to sell in the United States, even though the product would be sold outside the United States. With respect to the sales of the other two companies, Montgomery Ward and Fingerhut, there's really no evidence there was any offer to sell in the United States. There was evidence that we had a sales rep in the U.S. who would go around and show people the product, but there wasn't an offer to sell that would meet the definition of 271A under the ROTAC standard. So we could break that down a little bit for what value that has. Now, he talks about can he meet the objective recklessness standard as a matter of law. For the redesigned Deep Fryer, I don't think there's any question that there's no way he could do it probably even as a matter of fact. Pentalpha had an opinion of a competent patent attorney who gave a competent opinion that the redesigned Deep Fryers did not infringe literally, which was correct, and that they did not infringe under the doctrine of equivalence largely because the prosecution history is stoppable. And it's before this court whether or not he's right. For him to suggest that, oh, it was objectively reckless for my client to rely on that opinion of a competent attorney, a competent patent attorney, is incorrect. Help me out on one factual question. You objected to the jury instruction on 271B with respect to knowledge? Absolutely. We had a debate on that, both in the context of the jury instruction and in the context of the jury charge because we objected very clearly at the close of the evidence on the ground that Manville prevented them from getting to the jury for the pre-April 1998. That's very clear to me. All right. Thank you, Mr. Dunnegan. Thank you, Your Honor.